69 A.3d 1104

**Darnell FIELDS**

v.

**STATE of Maryland.**

**Clayton Colkley**

v.

**State of Maryland.**

**Nos. 53, 81 Sept. Term, 2012.**

Court of Appeals of Maryland.

July 9, 2013.

652

654

Brian L. DeLeonardo, Panel Attorney for the Office of the Public Defender (DeLeonardo, Smith, & Associates, Reisterstown, MD; Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner Fields.

Brian L. Zavin, Asst. Public Defender (Paul B. DeWolfe, Public Defender, of Baltimore, MD) on brief for Petitioner Colkley.

Todd W. Hesel, Asst. Atty. Gen. (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

BARBERA, J.

This case involves a shooting in Baltimore, Maryland that left one man dead and two other individuals wounded. Petitioners, Darnell "Pooh" Fields and Clayton "Coco" Colkley, were tried jointly and convicted of numerous crimes arising from the shootings. The judgments against both men later were reversed by the Court of Special Appeals and the case was remanded for a new trial. Petitioners were re-tried jointly before a jury and again were convicted. The Court of Special Appeals affirmed the more serious of the judgments of conviction.

Petitioners separately sought this Court's review of the judgments. We granted review of several questions common to the two petitions:

1. Where an internal affairs investigator for the police found "facts sustained" against officers, did the trial court err in refusing to permit the defense to inspect internal investigation division files concerning misconduct by the officers and, at trial, in refusing to allow the defense to cross-examine the officers about the misconduct?

2. Does the former testimony exception to the hearsay rule bar the admission of prior testimony by a witness who, subsequent to providing the testimony, was convicted of perjury?

3. Did the Court of Special Appeals err in holding that trial counsel was not ineffective for failing to move for the admission of prior testimony under the former testimony exception or, in the alternative, that the trial court did not abuse its discretion in refusing to propound a missing witness instruction?

---

* Bell, C.J., participated in the hearing of this case, in the conference in regard to its decision and in the adoption of the opinion, but he retired from the Court prior to the filing of the opinion.

*See Fields v. State,* 427 Md. 606, 50 A.3d 605 (2012); *Colkley v. State,* 429 Md. 81, 54 A.3d 759 (2012).

For the reasons that follow, we reverse the judgment of the Court of Special Appeals on the first question, with instructions to vacate the judgments of conviction and remand the case for retrial. Given our disposition of the case on the basis of the first question, we do not reach the remaining questions.

## I.

### *The Shooting*

The crimes giving rise to this appeal occurred on May 28, 2003. On that day, in what fairly can be described as a "revenge-type shooting spree," James "Buck" Bowens was killed by a single gunshot wound and William Courts was shot ten times, but survived. In the spring of 2005, a jury found Petitioners guilty of numerous crimes related to that incident. In 2007, for reasons unrelated to the present appeal, the Court of Special Appeals reversed Petitioners' convictions and remanded the cases for a new trial. *Fields v. State,* 172 Md.App. 496, 916 A.2d 357 (2007), *cert. denied,* 399 Md. 33, 922 A.2d 574 (2007).

Petitioners were retried jointly in February 2010, again before a jury, and were again convicted of multiple crimes in connection with the May 28, 2003, shooting spree. It is unnecessary, for present purposes, to undertake a detailed summary of the facts as they developed at the 11–day retrial.[1] It suffices to provide the following general overview of what the jury, hearing all the evidence, would have been entitled to believe.

William Courts and his brother David Courts, together with their confederates, ran a drug-dealing operation based in the Lafayette Avenue and Port Street area of East Baltimore. Evidently, there had been tension between the Courts broth-

---

**1.** A complete narration of the facts, as developed at the retrial, can be found in the opinion of the Court of Special Appeals in the present appeal. *Colkley v. State,* 204 Md.App. 593, 42 A.3d 646 (2012).

ers and a rival drug-distribution organization led by Eric Horsey. Horsey, a leading witness for the State at Petitioners' trial, and others were standing outside Teamsters Hall in Baltimore in January 2003, when a car driven by one of the Courts brothers pulled up. Horsey observed the ensuing argument between the occupants of the vehicle and his own companions. What was initially a verbal altercation led to gunfire that left Horsey's best friend dead and Horsey's brother wounded. Horsey made several attempts at retaliation against those he believed to be responsible for the January 2003 shooting, namely, the Courts brothers.

In March 2003, Petitioner Colkley contacted Horsey and offered to kill the Courts brothers for money. Horsey eventually agreed to Colkley's proposal but told Colkley that, if the killings were not done by the upcoming Monday, the deal was off. Horsey returned from out-of-town that Monday to find the Courts brothers still alive. At that time, and evidently for some time thereafter, Horsey and Colkley did not revisit the subject of their earlier agreement.

Two months later, William Courts, his cousin Jermaine Lee, and Bowens, all of whom were part of what was described at trial as the "Lafayette and Port" drug-distribution group, were sitting on the steps of a residence in the 1700 block of Port Street when a car drove up the street toward them. Bowens approached the car saying something like, "[T]hat car's cool. That's Pooh's car," referring to Petitioner Fields, the driver of the car. As Bowens came within a few feet of the vehicle, Petitioner Colkley opened a passenger door and shot Bowens in the chest, killing him. Then, according to Lee, the occupants of the car continued shooting at William Courts. Courts sustained ten gunshot wounds that day but survived. Yvette Hollie, a bystander, was also shot once in the arm during the May 28, 2003, incident.[2]

_____

2. Petitioners were acquitted at the 2005 trial of the charges related to the shooting of Ms. Hollie.

According to Horsey, Petitioner Colkley, wrongly believing that William Courts had died from his wounds, renewed contact with Horsey within several days of the shooting to report that he had killed William Courts and another individual on Port Street. Colkley demanded payment from Horsey for those efforts, pursuant to the agreement the two men had struck in March. Horsey, who had learned that William Courts survived the shooting, refused to compensate Colkley.

In a separate incident, William's brother, David Courts, was killed, evidently having been shot while driving a vehicle. In connection with that shooting, Horsey testified that, sometime after Petitioner Colkley called him and misreported the death of William Courts, Colkley again contacted Horsey, this time claiming responsibility for the death of David Courts. Horsey, upon verifying that David Courts was dead, paid Petitioner Colkley $10,000 in connection with that killing. Horsey testified that Colkley revealed his plan to split the money with one Brian "Bee" Smith, who had participated in the shooting of Bowens and William Courts, and give $500 of the remaining funds to Edwin "E Money Bags" Boyd, who had been shot in the eye during the Port Street incident.

Detective Sergeant Darryl Massey, the supervisor of a homicide unit team of the Baltimore City Police Department, and Detective Kerry Snead, the primary investigator of the Port Street shootings, testified about the investigation of the shootings. Our analysis of the first, two-part question presented by Petitioners relates to the testimony of the two detectives. We therefore defer, for now, the procedural and evidentiary facts related to that question.

The jury found Petitioner Colkley guilty of the second-degree murder of Bowens, attempted murder of William Courts and conspiracy to commit his murder, and related handgun offenses. The jury found Petitioner Fields guilty of conspiracy to murder William Courts, second-degree assault on Courts, and related handgun offenses. The Court of Special Appeals affirmed, for the most part, the judgments of

conviction of both Petitioners. *See Colkley v. State,* 204 Md.App. 593, 42 A.3d 646 (2012).

## II.

### *Discussion*

As noted at the outset, we granted certiorari on three questions presented, only one of which we need answer. That question, once again, reads:

> Where an internal affairs investigator for the police found "facts sustained" against officers, did the trial court err in refusing to permit the defense to inspect internal investigation division files concerning misconduct by the officers and, at trial, in refusing to allow the defense to cross-examine the officers about the misconduct?

By its text, the question challenges two rulings, by different judges of the Circuit Court. The two rulings—one pre-trial, the other, following commencement of trial—are factually and, as ultimately considered by the trial judge, procedurally intertwined. We therefore consider them together, starting with the facts giving rise to both rulings.

### A.

### *Procedural Background*

Before the 2010 retrial, Petitioner Colkley filed a written motion, later joined by Petitioner Fields,[3] requesting issuance of a subpoena duces tecum to the Baltimore City Police Department ("Department"). The requested subpoena was for the production of certain records including, pertinent here, Internal Investigations Division ("IID") files related to a complaint, made subsequent to the 2005 trial, against Detective Sergeant Darryl Massey and Detective Kerry Snead.

---

**3.** Counsel for Petitioner Fields orally joined Petitioner Colkley's written motion for issuance of the subpoena at the hearing on the Baltimore City Police Department's motion to quash the subpoena. The State does not dispute that, by doing so, Petitioner Fields, like Petitioner Colkley, has preserved the issue for appellate review.

Both detectives were involved in the investigation of the May 28, 2003, shootings. It is undisputed that the Department's internal investigation resulted in a finding by the IID investigator that the allegations against the two detectives were "sustained" and the case "administratively closed."

The Department responded to the subpoena request with a motion to quash the subpoena. In August 2009, the Circuit Court held a two-day hearing on the Department's motion to quash the subpoena. At the outset of the first day of the hearing, Petitioners proffered in support of the subpoena that Detective Sergeant Massey and Detective Snead had been the subjects of an IID complaint in which both officers were accused (evidently among other officers) of "committ[ing] and conspiring to commit theft by deception by submitting fraudulent, daily and court overtime slips between January 1, 2006 and January 31, 2007." Petitioners further proffered that the facts underlying the complaint had been found "sustained" by the IID. Petitioners indicated that investigatory reports contained in the file would reveal that the officers had been under Departmental surveillance, corroborating the complaint. Petitioners argued that the information concerning the alleged misconduct, if in fact it had occurred, would be relevant to the credibility of the detectives, which in turn would be relevant to the integrity of the photo arrays and witness interviews conducted in connection with the investigation of the Port Street shootings. According to Petitioners, the information they believed is contained in the IID files would serve to impeach the detectives, partly in connection with, in the words of counsel for Petitioner Colkley, "allegations that an officer forced somebody to make statements."

Counsel for the Department acknowledged that Petitioners had "adequately identified" an IID matter. Counsel for the Department noted, though, that a finding that the allegations of the complaint were "sustained" is not dispositive of an officer's guilt. Counsel explained that, if the Department's Charging Committee were to agree with that finding and decide to bring charges, then the officer would be entitled to a

Trial Board hearing, at which the officer could be exonerated.[4] Counsel for the Department argued (mistakenly, as it turns out) that, in any case, the detectives' complaints were still "open" and, as such, "these files are not discoverable." The Assistant State's Attorney prosecuting Petitioners' case added, upon the court's inquiry, that the investigation had been referred to the Office of the State's Attorney, which declined to prosecute, and that "everything had been closed out." Petitioners maintained in response that discovery of the IID files is "dispositive to the defense of this case."

The court determined that it would be necessary to conduct an *in camera* review of the summaries of the IID files before ruling on the Department's motion to quash. Just before the court adjourned for the day, counsel for the Department asked if she should have the IID files ready to produce when the hearing resumed, in the event the court deemed it necessary to review the files in their entirety. The court responded, "If there is anything that can be duplicated out of that for Court review if I decide to get to that stage we'll do it."

The hearing resumed two days later. At the outset, counsel for the Department presented to the court letters signed by the Police Commissioner dated June 22, but without a year, indicating—contrary to counsel's earlier representation—that

---

**4.** The Law Enforcement Officers' Bill of Rights ("LEOBR"), Md. Code (2003, 2011 Repl. Vol.), §§ 3–101 *et seq.* of the Public Safety Article, describes the investigative process. The LEOBR treats differently complaints that are "sustained" from other possible findings and outcomes. Under § 3–110(a)(1), a law enforcement officer may request to have expunged the record of a formal complaint made against him or her (i) if the investigating agency exonerated the officer of the charges or "determined that the charges were unsustained or unfounded," or (ii) if "a hearing board acquitted the law enforcement officer, dismissed the action, or made a finding of not guilty." Subsection (b) adds that "[e]vidence of a formal complaint against a law enforcement officer is not admissible in an administrative or judicial proceeding if the complaint resulted in an outcome listed in subsection (a)(1) of this section." Notably, § 3–110(a) is silent as to complaints that are "sustained" by the investigating agency. Petitioners suggest that, consequently, § 3–110(b) does not prohibit introduction of evidence related to a sustained complaint. We express no opinion on that matter of statutory construction.

the IID cases against Detective Sergeant Massey and Detective Snead had been "administratively closed." Counsel for the Department was unable to explain why the cases had been administratively closed or why that status was not reflected in the summaries of the IID files that had been printed on July 5, 2009, and reviewed by the court *in camera*.

The court made no comment in response to that information and simply advised the parties of the court's ruling on the Department's motion to quash:

> Counsel, I have reviewed the files [5] and there is nothing else of any note in the summaries. I think I have been absolved of making an interesting legal decision about a pending charge of which the world is aware. I think you have as much information as you're going to get. You can use that for whatever purposes you think is available at trial.

Petitioners requested, and the court allowed, further argument on the subject. Petitioners responded first to the information that the IID case had been administratively closed: "That means that [the Department is] not investigating it further … not going to make a decision regarding any penalty at all, but it doesn't say that the incident didn't happen, that the thefts did not occur[.]" Petitioners, through counsel for Colkley, then repeated their request for discovery of the IID files, which would give them the chance to discern the facts found by the investigating officer that would have been "taken in front of the Trial Board," had the matter come to that. Counsel then asked the court "to read what I saw before Your Honor makes his conclusion." Counsel further argued:

> I believe that … the clear and convincing evidence is in that file and I think if we open that file and look at what the findings that the [presumably investigating] officers made, that was found that he determined actually occurred that

---

5. It is clear from the transcript that the court here was referring only to the summaries of the IID files that were reviewed *in camera*.

were sent for the Trial Board to make a decision, I think you'll see the clear and convincing evidence.

The court, in the end, did not change its ruling denying discovery of the files. Noting that Petitioners would be generating at most "a collateral issue for impeachment," the court reasoned that "the veil of secrecy that should surround the Police Department's investigation of its own should be pierced . . . only, if in fact the action is formally found to have happened and that a penalty is necessary under the circumstances."

Petitioners asked the court about the effect of its ruling upon their seeking at trial to impeach the detectives, under Maryland Rule 5–608(b),[6] with the facts set forth in their proffer to the motion court. The court responded, "You may be able to cross-examine them about that. That is a ruling that the trial judge will make." The court added, "But the only thing I warn everyone about before you get started—this is purely a collateral matter and you will be stuck with the answers you get if you go into this area."

As Petitioners predicted, the impeachment issue arose at trial when the State made a motion *in limine* to bar Petitioners from conducting cross-examination of the detectives about the subject of the IID investigation. Petitioners objected, noting that, although they had not been granted discovery of the IID files, the existence of the IID files was conceded and the allegations contained in that IID complaint had been found "sustained" as a result of the initial IID investigation of the detectives' alleged misconduct. Petitioners argued that those

---

**6.** Maryland Rule 5–608(b) provides:

**Impeachment by examination regarding witness's own prior conduct not resulting in convictions.** The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

facts satisfied the reasonable factual basis requirement of Rule 5–608(b).

The trial judge, who had not ruled on the discovery issue, disagreed. The court ruled:

> [Y]ou would seek to impeach by examination pursuant to 5–608 these individuals based upon that prior conduct, but you don't have any of the records surrounding it and you can't use them otherwise. Then, as a result, there's no need for me to conduct a hearing outside the jury because there is no way you can establish a factual basis for asserting that the conduct occurred and since it cannot be proven by extrinsic evidence . . . my ruling is that there cannot be any mention of [the IID investigation].

For reasons we shall explain next, we find legal error in connection with both the motion court's ruling denying Petitioners' discovery request and the trial court's ruling denying Petitioners the opportunity to show a reasonable factual basis for cross-examination of the detectives, under Maryland Rule 5–608(b).

### B.

### *The Discovery Ruling*

Petitioners argue that the motion court committed legal error in departing from the analysis this Court has mandated be followed when a defendant in a criminal case seeks discovery of material that the law otherwise protects as confidential. Based on the record before us, we agree.[7]

The starting point for our analysis is the Maryland Public Information Act ("PIA"). The PIA provides that "a custodian

---

7. We are hobbled somewhat in that effort. Notwithstanding the court's directive to seal the file summaries and the Department's letter and make them part of the record in the case, *see Zaal v. State,* 326 Md. 54, 88 n. 15, 602 A.2d 1247 (1992) (stating that trial courts are to "mark and seal the records excluded so that the judge's determination in that regard may be reviewed on appeal"), the appellate record does not contain those documents, much less the IID files themselves. Counsel for the State has informed us that efforts to obtain those documents so far have proved unsuccessful.

[of public records] shall permit a person or governmental unit to inspect any public record at any reasonable time," "[e]xcept as otherwise provided by law." Md. Code (1984, 2009 Repl. Vol., 2011 Supp.), § 10–613(a)(1) of the State Government Article ("SG"); *see generally* SG § 10–611 through 10–630. Certain information and types of records, including "personnel records," are generally exempt from public disclosure under SG § 10–616(i).[8] "[I]nternal affairs records involving alleged administrative rule violations" by police officers are "personnel records" under SG § 10–616(i), and therefore are "mandatorily exempt from disclosure by the custodian of records" under the PIA. *Montgomery Cnty. v. Shropshire*, 420 Md. 362, 383, 23 A.3d 205 (2011).

■ A person facing criminal charges may be entitled nonetheless to discovery of confidential personnel records. We have emphasized that, "[w]hile confidentiality does go to discoverability, it does not guarantee insulation of the confidential matter from disclosure. The confidentiality interest must be balanced, in this context, against the confrontation and due process rights of the defendant." *Robinson v. State*, 354 Md. 287, 309, 730 A.2d 181 (1999). *Cf. Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (weighing a criminal defendant's right of confrontation at trial against the State's interest in maintaining the confidentiality of juvenile records); *Goldsmith v. State*, 337 Md. 112, 127–29, 651 A.2d 866 (1995) (recognizing that the "defendant's constitutional rights at trial may outweigh the victim's right to assert a privilege"). Whether a defendant is entitled to discovery of documents otherwise protected from disclosure

---

**8.** Maryland Code (1984, 2009 Repl. Vol., 2011 Supp.), § 10–616(i) of the State Government Article ("SG") provides:

(i) *Personnel records.*—(1) Subject to paragraph (2) of this subsection, a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information.

(2) A custodian shall permit inspection by:

(i) the person in interest; or

(ii) an elected or appointed official who supervises the work of the individual.

by the PIA is ascertained by resort to a test well-established in Maryland. That test—which has application beyond police personnel records of the type at issue here—balances competing interests: those of the party holding the protection of confidentiality and those of the defendant who has the right to confront the witness against him or her. *See Zaal v. State,* 326 Md. 54, 81–87, 602 A.2d 1247 (1992) (requiring the defendant to demonstrate a need for pre-trial disclosure and, if established, requiring the trial court to strike the balance between the victim's privacy and the defendant's right to a fair trial); *see also Robinson,* 354 Md. at 308, 730 A.2d 181 (concluding that the confidentiality provisions of the LEOBR did not preclude the defendant from discovering certain statements, relating to the criminal case against the defendant, that were made by two police officers during an internal investigation).

■ Under what we shall refer to in this opinion as the *Zaal* test, a defendant in a criminal case who, for purposes of confronting an adverse witness, seeks discovery of otherwise confidential information about that witness has the initial burden to demonstrate a "need to inspect," that is, "a reasonable possibility that review of the records would result in discovery of usable evidence." *Zaal,* 326 Md. at 81, 602 A.2d 1247. The sufficiency of the need to inspect depends upon factors such as "[t]he nature of the charges brought against the defendant," "[t]he issue before the court," and the "relationship . . . between the charges, the information sought, and the likelihood that relevant information will be obtained as a result of reviewing the records." *Id.* at 81–82, 602 A.2d 1247.

■ If the court determines that the defendant has established the need to inspect the material at issue, then "the court may elect to review the records alone, to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to such restrictions as the court requires to protect the records' confidentiality." *Id.* at 87, 602 A.2d 1247. In deciding how to proceed with the *in camera* review, the court should take into account,

among other factors, "the degree of sensitivity of the material to be inspected; the strength of the showing of the 'need to inspect'; whether the information sought is readily identifiable; considerations of judicial economy, etc." *Id.* A strong need to inspect weighs in favor of allowing counsel to participate in the review as officers of the court. *Id.*

When the records at issue contain sensitive information, it may be appropriate for the court alone to review the material. *Id.* We have cautioned, though, that in such circumstances the court "must approach its task cognizant of the fact that it is not an advocate and, in most instances, will not, and, indeed, cannot be expected, to discern all the nuances or subtleties which may render an innocuous bit of information relevant to the defense." *Id.* at 87–88, 602 A.2d 1247. "Whether there is impeaching information in a file is not easily determined. Indeed, whether information is impeachment evidence, or may otherwise be characterized, often depends upon the circumstances, including context, and, to a large extent, the perception of the person interpreting it." *Id.* at 82, 602 A.2d 1247. Consequently,

> well-prepared defense counsel—one who has spoken extensively with his client, developed a strategy for the trial and is familiar, thoroughly, with the State's case—would then be able to bring the advocate's eye to the review of the records, thus, protecting the interest of the defendant in ensuring that relevant, usable exculpatory or impeachment evidence is discovered.... Moreover, by having the benefit of counsel's input on the critical questions of relevance and admissibility, the court is enabled to rule more responsibly.

*Id.* at 86–87, 602 A.2d 1247.

■ The court's ultimate determination of whether to allow discovery of the sought-after information does not rest on whether the records themselves are admissible at trial, but rather on whether disclosing that material to the seeking party would reveal or lead to admissible evidence. We made that plain in *Zaal:* "[T]he court's review is not to determine whether, and, if so, what, is 'directly admissible;' rather, it is

to exclude from the parties' review material that could not, in anyone's imagination, properly be used in defense or lead to the discovery of usable evidence." *Id.* at 88, 602 A.2d 1247. Therefore, "[o]nly when the records are *not even arguably relevant and usable* should the court deny the defendant total access to the records." *Id.* (emphasis added). Yet, even when discovery is appropriate, the material disclosed should be limited to that which is necessary to satisfy the demonstrated need to inspect. *See Baltimore City Dep't of Social Servs. v. Stein*, 328 Md. 1, 31, 612 A.2d 880 (1992).

The court in the present case properly initiated the *Zaal* analysis by requiring Petitioners to proffer their particularized need for the protected information. Petitioners responded with a detailed proffer explaining what they expected to discover within the IID files and what in those files they hoped would be useful at trial. The Department did not dispute Petitioners' characterization of the allegations against the detectives; neither did the Department dispute that the complaint was "sustained" by the IID.

■ By their proffer, Petitioners carried their burden of showing a need for access to the IID files. That, then, required the motion court, pursuant to the *Zaal* test, to conduct some form of *in camera* review of the files. The court opted to review *in camera*, not the IID files themselves, but rather only the *summaries* of the files, notwithstanding that Petitioners had sought discovery of the entire files and counsel for the Department stood ready to supply the files (or at least copies of them) for the court's review. Apparently, the court did not consider giving counsel *in camera* access, as officers of the court, even to the file summaries, much less to the complete files.

The State does not contest any of this. Instead, the State relies simply on the general proposition that the court possesses the discretion to deny discovery of documents such as those sought by Petitioners, and the State argues that, here, the court did not abuse that discretion in ruling as it did. The State suggests that, given the specificity of Petitioners' proffer

regarding the nature of the IID complaint against the detectives, the court properly denied Petitioners discovery in part because "disclosure of the files would only have impinged on the officers' confidentiality interest without providing the defense with any information it did not already have." The State also likens the "sustained" IID complaint to a mere accusation of misconduct not usable for impeachment under Maryland Rule 5–608(b). *See Thomas v. State,* 422 Md. 67, 77, 29 A.3d 286 (2011) (stating that "mere accusations of crime or misconduct may not be used to impeach" (quoting *State v. Cox,* 298 Md. 173, 179–80, 468 A.2d 319 (1983))). Consequently, the State argues, the files are "not even arguably usable or relevant" under the *Zaal* test. We disagree with both aspects of the State's argument.

Given Petitioners' proffer, the motion court ran afoul of the *Zaal* test by declining to review the content of the IID files and opting instead to examine *in camera* only the file summaries prepared by the Department. It is true that, on the first day of the two-day hearing on the Department's motion to quash, Petitioners did not press the court to review the entire files, rather than merely the summaries. Nevertheless, Petitioners argued vigorously on the second day of the hearing for *in camera* examination of the complete files, which would supply the very information counsel suspected was contained therein and thereby provide them proper impeachment material for cross-examination, under Maryland Rule 5–608(b), of State witnesses Detective Sergeant Massey and Detective Snead.

■ We repeat, and apply to this case, our prior admonition in *Zaal* that a court in reviewing material for discovery purposes may deny a defendant any form of access to the material only if nothing in it, "in anyone's imagination, [could] properly be used in defense or lead to the discovery of usable evidence." 326 Md. at 88, 602 A.2d 1247. Given Petitioners' proffer, the motion court, at the minimum, had the obligation to review the IID files, not simply the summaries, to decide whether the files contained anything "even arguably relevant

and usable" by the defense to impeach the detectives and, *only* if the answer to that question were "no," then "deny the defendant total access to the records." *See id.*

We cannot endorse, moreover, the court's reasoning that IID records are discoverable only when the alleged misconduct has been *"formally* found to have happened and that a *penalty* is necessary under the circumstances." (Emphasis added). As more fully explained, *infra,* the Maryland Rules authorize trial courts to allow cross-examination of a witness about a prior bad act, not resulting in conviction, that relates to the witness's credibility, so long as the cross-examiner can establish "a reasonable factual basis" for the inquiry. *See* Md. Rule 5-608(b), *supra* note 6. We decline to embrace a higher standard for *discovery* of possible impeachment evidence than we would for *use* of discovered impeachment material for purposes of cross-examination under Maryland Rule 5-608(b).

We also reject the court's rationale for nondisclosure that Petitioners already possessed the information they sought from the IID files. Petitioners were required to—and did— carry the burden under *Zaal* of showing a need to inspect. They did so by offering a detailed proffer of the alleged misconduct underlying the IID complaint, which was deemed "sustained," and by explaining how that misconduct related to the veracity of the detectives and the potential value of that impeachment evidence to the defense's theory of the case. The court erred when it denied Petitioners' counsel *any* access to the IID files on the basis that defense counsel already possessed the information contained therein. Put simply, the fact that counsel already had some (or even a good) idea of what is in the IID files does not make the files any less discoverable.

We do not take lightly the interest of the Police Department in maintaining the confidentiality of documents related to the internal investigation and discipline of its employees for violating administrative procedures. *See Shropshire,* 420 Md. at 381, 23 A.3d 205 (describing the "significant personal information" contained in a police department internal investigation

record); *Mayor of Baltimore v. Md. Comm. Against the Gun Ban*, 329 Md. 78, 95, 617 A.2d 1040 (1993) (noting that the "public interest in the confidentiality of investigations of police officers is demonstrated by" the LEOBR). Nonetheless, that confidentiality interest must yield, in the appropriate case, to the defendant's interest in having an opportunity to mount a defense and confront the witnesses against him. *See Robinson*, 354 Md. at 308, 730 A.2d 181 (noting that, "when due process concerns have been involved, the confidentiality of [internal investigation] records" yields to those concerns). *Cf. Davis*, 415 U.S. at 320, 94 S.Ct. 1105 (concluding that, in the case before the Court, "the State's desire that [the witness] fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of [the defendant] to seek out the truth in the process of defending himself").

The Department's interest in the confidentiality of personnel records can be protected in ways other than complete denial of access by the defendant. We suggested in *Zaal* that, if the court reviews the material *in camera* and determines that discovery is warranted, then the court could grant access only as to those portions of the material that *in camera* inspection revealed are pertinent to the defense's case, "subject to instructions as to what, and how, relevant information is to be used and otherwise restricting dissemination." *Id.* Alternatively, a court might conduct "[a]n expanded *in camera* proceeding, one in which counsel for the defense and the State participate." *Id.* Another option for the court is to "permit[ ] the review of the records by counsel in their capacity as officers of the court[,]" either alone or in the presence of the court. *Id.* at 86, 602 A.2d 1247. The court likewise could issue an order "prohibiting disclosure to anyone, including the defendant, of anything in the records unless expressly permitted by the court." *Id.*

For all these reasons, we conclude that the motion court committed legal error by failing to adhere to the protocol set forth in *Zaal* and other cases when denying Petitioners, through their counsel, access to the IID files developed in

connection with the allegation that Detective Sergeant Massey and Detective Snead had submitted falsified time sheets.

## C.

### The Impeachment Ruling

The trial court, relying on the motion court's discovery ruling, denied Petitioners the opportunity to cross-examine Detective Sergeant Massey and Detective Snead. The court assumed that the motion court's denial of discovery of the IID files automatically precluded Petitioners from seeking to impeach the detectives' credibility with the subject matter of the IID investigation. That led the trial court to deny Petitioners the opportunity to demonstrate their entitlement to cross-examine the detectives on the subject, notwithstanding that the court knew, because defense counsel made it known, that the IID investigation was based on the "sustained" allegation that the detectives had been "stealing overtime." Therein lie several errors on the part of the trial court.

 "The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to confront the witnesses against him or her." *Pantazes v. State*, 376 Md. 661, 680, 831 A.2d 432 (2003). In exercising that right, a defendant may cross-examine a witness in order to impeach his or her credibility. *Id.* The common law rules regarding impeachment of a witness by resort to his or her prior bad acts, now codified in Maryland Rule 5–608(b), were laid out by us in *State v. Cox*, 298 Md. 173, 468 A.2d 319 (1983). We said in *Cox* that, although "mere accusations of crime or misconduct may not be used to impeach," we have allowed, given a proper showing, cross-examination of a witness regarding "prior bad acts which are relevant to an assessment of the witness' credibility." *Id.* at 179, 468 A.2d 319. To be sure, "if the bad acts are not conclusively demonstrated by a conviction, the trial judge must exercise greater care in determining the proper scope of cross-examination." *Robinson v. State*, 298 Md. 193, 200, 468 A.2d 328 (1983).

Nevertheless, such inquiry is allowed "when the trial judge is satisfied that there is a reasonable basis for the question, that the primary purpose of the inquiry is not to harass or embarrass the witness, and that there is little likelihood of obscuring the issue on trial." *Cox,* 298 Md. at 180, 468 A.2d 319. In such instances, though, "the cross-examiner is bound by the witness' answer and, upon the witness' denial, may not introduce extrinsic evidence to contradict the witness or prove the discrediting act." *Id.* That said, the trial judge must be alert to the possibility of prejudice outweighing the probative value of the inquiry. *Id.; see* Md. Rule 5–403. Indeed, "when impeachment is the aim, the relevant inquiry is not whether the witness has been accused of misconduct by some other person, but whether the witness actually committed the prior bad act. A hearsay accusation of guilt has little logical relevance to the witness' credibility." *Cox,* 298 Md. at 181, 468 A.2d 319.

■■■ The trial court in the present case erred in assuming that, simply because Petitioners were denied any access to the IID files, they were precluded automatically even from attempting to demonstrate to the trial court a reasonable factual basis for cross-examination of the detectives. We know of no statute, rule of procedure, or case that supports the trial court's reasoning. The trial court further erred in its application of Maryland Rule 5–608(b), given the undisputed facts that the Department's IID investigator had investigated the allegation of timesheet tampering by the detectives and found the allegation "sustained," and that finding was not challenged, must less overturned, by a Trial Board. *See supra* note 4 and accompanying text.

Based on this record, there is no doubt that, given the opportunity, Petitioners could have established a reasonable factual basis, required by Maryland Rule 5–608(b), that the asserted bad conduct by Detectives Massey and Snead had occurred. There is no doubt, moreover, that such conduct would be probative of the detectives' "character for untruthfulness," as is also required by the Rule. Neither does the record

suggest, on the other side of the balance, a good reason why the evidence would have been subject to exclusion on any other basis. *See, e.g.,* Md. Rule 5–403. We therefore conclude that the trial court erred in failing to allow Petitioners, pursuant to Maryland Rule 5–608(b), the opportunity to demonstrate a reasonable factual basis for cross-examination of the detectives about the matter.

### D.

### *Harmless Error*

The State, perhaps suspecting we might decide the discovery and impeachment issues as we have, attempts to persuade us that the errors are harmless to Petitioners' right to a fair trial. We are not convinced.

 Our well-established test for harmless error was adopted in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976):

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded— may have contributed to the rendition of the guilty verdict.

*Id.* at 659, 350 A.2d 665.

 The State maintains that the testimony of Detective Sergeant Massey and Detective Snead was relatively unimportant to the State's case, and impeachment of them using information in the IID files would have been of only marginal value to Petitioners' defense. But as our harmless error standard makes clear, it matters not that the detectives' testimony, as compared to other witnesses, was, in the State's view, less important to the State's case. Rather, in order for the State to prevail on a theory of harmless error, we must be satisfied beyond a reasonable doubt that the errors—here, the

denial of access to potentially significant impeachment evidence and the subsequent denial of an opportunity to demonstrate a reasonable factual basis for cross-examination—did not affect the outcome at trial. Our review of the testimony offered by the two detectives and the exhibits admitted through them does not persuade us, beyond a reasonable doubt, that an attack on their credibility would not have influenced the jury's verdicts.

Detective Kerry Snead was the primary detective, meaning he was assigned to lead the investigation of the shooting. In his testimony, he used a previously admitted sketch of the area that showed the lay of the land and photos of the crime scene to describe some of the physical evidence recovered in the investigation. Detective Snead also stated that he was present during the autopsy of the murder victim, James "Buck" Bowens. It was Snead who recovered from the medical examiner the fatal bullet that was removed from Bowens's body.

Detective Sergeant Darryl Massey was the supervisor of the homicide unit team (which included Detective Snead) that investigated the shooting. While describing his interviews of both Petitioners at the police station, Detective Sergeant Massey relayed to the jury statements made by Petitioner Colkley during his interview and while making a telephone call from the station. In particular, Detective Sergeant Massey testified that Petitioner Colkley stated "Yo, Pooh, what you tellin' them people?" as he walked past the window of the holding cell where Petitioner Fields was visible inside. This statement came just minutes after Colkley denied to the detective knowing anyone named "Pooh." Detective Sergeant Massey also testified about the interviews and photo arrays conducted with two witnesses who were deceased by the time of the retrial, Edwin Boyd and Qonta Waddell. The tape recordings of those interviews were played for the jury.

We agree with the State that the accounts of two other live witnesses, Eric Horsey and Jermaine Lee, were likely more compelling to the jury than the testimony of the

detectives. Nevertheless, we decline the State's invitation to speculate as to what the jury may have made of the potentially admissible impeachment evidence contained in the IID files. "In a jury trial, judging the credibility of witnesses is entrusted solely to the jury, the trier of fact; only the jury determines whether to believe any witnesses, and which witnesses to believe." *Robinson,* 354 Md. at 313, 730 A.2d 181 (citing cases). What we can say for certain is that the State has not made its case that the legal errors committed by the motion court and the trial court were harmless beyond a reasonable doubt. Petitioners, accordingly, are entitled to a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

McDONALD, J., concurs.

McDONALD, J., concurring.

I concur in Judge Barbera's opinion on behalf of the Court. I write only to point out a possible alternative basis of decision under the Maryland Public Information Act ("PIA"), Maryland Code, State Government Article ("SG"), § 10–611 *et seq.*, that the opinion does not address. I simply wish to make explicit that we are not resolving the merits of that alternative basis by this decision.

As the Court indicates, the PIA establishes a general rule that a custodian of public records is to allow inspection of public records in response to a PIA request, subject to certain exceptions.[1] One set of exceptions requires a custodian to withhold records if required to do so by other law.[2] Two other categories of exceptions require the custodian to with-

---

1. SG §§ 10–612, 10–613.

2. SG § 10–615.

hold certain types of records [3] or certain types of information (not necessarily an entire record); [4] these exceptions are sometimes referred to as "mandatory exceptions." A fourth category of exceptions allows a custodian to withhold certain records or information if the custodian finds that disclosure would be "against the public interest"; these exceptions are sometimes referred to as "discretionary exceptions." [5]

There is an important qualification to both the mandatory and discretionary exceptions to the PIA's general rule of disclosure. Each of the statutory sections setting forth these exceptions begins with the proviso that records are to be withheld under these exceptions "[u]nless otherwise provided by law." *See* SG §§ 10–616(a), 10–617(a), 10–618(a). For example, SG § 10–616, which lists 21 categories of records that are subject to mandatory exceptions, states in pertinent part:

> (a) *Unless otherwise provided by law*, a custodian shall deny inspection of a public record as provided in this section.

Among the records later listed "in this section" are "personnel records," such as those at issue in this case. [6]

The bottom line is that the PIA always defers to "other law." If other law requires that a public record be kept confidential, the record remains confidential under the PIA. If other law requires disclosure of a record, the record is disclosable under the PIA even if it falls within one of the PIA's many categories of exceptions to disclosure.

---

3. SG § 10–616.

4. SG § 10–617.

5. SG § 10–618.

6. Among the records listed in SG § 10–616, in addition to government personnel records, are driver licensing records, student records, adoption records, letters of reference, images from traffic control monitoring systems, and a panoply of other records.

One issue that arises from time to time in various contexts and that has not been addressed by this Court to date is whether a validly-issued subpoena should be considered (1) compulsion under "other law" that overrides a PIA exception or (2) the equivalent of a PIA request subject to PIA exceptions. (As there are different types of subpoenas, issued by different entities, in many different contexts, it is conceivable that the answer might differ depending on context).

In this case, a judicial subpoena was issued for the internal affairs records, which are exempt from disclosure under the PIA pursuant to the personnel records exception, SG § 10–616(i). Neither *Montgomery County v. Shropshire,* 420 Md. 362, 23 A.3d 205 (2011), which involved a PIA request—but not a subpoena—for internal affairs records, nor *Zaal v. State,* 326 Md. 54, 602 A.2d 1247 (1992), which involved a subpoena for records made confidential by a federal statute in addition to a PIA exception, necessarily resolves the issue for this case.

The Court applies the *Zaal* analysis without addressing to what extent the compulsory process of the subpoena itself might constitute "other law" that overrides the PIA exception and leads to the same result. I have no problem with that approach in this case as the parties did not brief whether the subpoena satisfied the "other law" proviso of the PIA exception and I am content to leave the broader PIA issue to be resolved another day.