REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1281

September Term, 2014

_____

DARRELL BELLARD

v.

STATE OF MARYLAND

_____

Nazarian,
Reed,
Zarnoch, Robert A.
  (Retired, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: August 31, 2016

This quadruple-murder case presents, among other things, the question of whether legislation repealing Maryland's death penalty in 2013 also created new rights for defendants facing life imprisonment without the possibility of parole. Darrell Bellard was convicted by a jury in the Circuit Court for Prince George's County of four counts of first-degree murder, three counts of conspiracy to commit murder, and other related offenses. The court (not a jury) sentenced him to life without parole for the first-degree murders and consecutive life sentences for the three conspiracy convictions.

On appeal, Mr. Bellard claims the circuit court erred by failing to strike the State's notice of intent to seek a sentence of life without parole, by sentencing him on more than one count of conspiracy to commit murder, by permitting the State to offer the testimony of an expert witness who was not timely disclosed in discovery, by admitting evidence of prior bad acts, and by denying his motion to suppress evidence. The State agrees that Mr. Bellard should only have been convicted and sentenced on one count of conspiracy, and because we agree as well, we vacate two of Mr. Bellard's three conspiracy convictions and the corresponding sentences. We disagree, however, that Mr. Bellard was entitled to have a jury determine his sentence, and we affirm his convictions and sentence in all other respects.

## I. BACKGROUND

On August 6, 2010 at 2:42 a.m., Officer Hong Park of the Prince George's County Police Department responded to an address in Lanham, where he was flagged down by a witness and directed to an apartment over a two-car garage. When Officer Park entered

the apartment, he saw a woman lying face-down on the ground in a pool of blood and three more bloody bodies—another woman and two children—on a bed in one of the bedrooms. All had suffered (and died) from gunshot wounds to the head. After surveying the apartment, which took about five minutes, Officer Park left and saw a man, later identified as Mr. Bellard, walking up the steps. Officer Park stopped him and asked him why he was there. Mr. Bellard responded that he was coming back to check on his friends.

Officer Park asked Mr. Bellard to "step down." Mr. Bellard walked down the steps, followed by Officer Park, proceeded to the yard, and came to rest near a big tree. Officer Park asked, "Just in case we need to talk again, can you just stand by for a second?" Mr. Bellard indicated that there was no problem, and Office Park left Mr. Bellard by himself; he was not placed under arrest or restrained in any way, and no one guarded him.

Sometime around 3:45 a.m., Officer Stephen Campbell responded to the scene and, shortly thereafter, saw Mr. Bellard leaning against a car. Officer Campbell asked Mr. Bellard his name and why he was there, and "told him that because he was there, we needed to talk to him and, if he would, I would like to take him down to our office and speak with him there." Mr. Bellard agreed to go to the station. Before being transported to the criminal investigation division ("CID"), Officer Donny Hacker told Mr. Bellard he needed to "stand by . . . [because they] just needed to talk to him." Mr. Bellard asked Officer Hacker if he could get his cigarettes from his car. After getting permission from a supervisor, Officer Hacker retrieved the cigarettes. For about the next half an hour, Mr. Bellard stayed at the scene, unattended and unrestrained. There were numerous officers present, and several

2

patrol cars at the scene, but Mr. Bellard only interacted with Officers Park, Detective Campbell, and Officer Hacker.

At approximately 4:00 a.m., Officer Hacker transported Mr. Bellard to CID. He was patted down for weapons before getting in the police car, but sat unrestrained in the front passenger seat, and he seemed calm and cooperative. Upon arriving at CID, officers escorted Mr. Bellard to an interview room, leaving the door open at Mr. Bellard's request after he mentioned that he was claustrophobic.

While Mr. Bellard was being interviewed, Detective Ober interviewed Frank Brooks, a distant relative of Mr. Bellard's by marriage. At approximately 7:30 a.m., Detective Campbell learned from Detective Ober that, according to Mr. Brooks, Mr. Bellard was a drug dealer from Texas and that he was mad at Mr. Brooks and his wife, Dawn (Mr. Bellard's brother's sister-in-law), because he had been "ripped off during a prior visit, and [thought] he was ripped off again."

When Detective Campbell confronted Mr. Bellard with this statement, Mr. Bellard admitted to bringing marijuana and a gun with him from Texas. Detective Campbell read Mr. Bellard his *Miranda*[1] rights. Mr. Bellard signed a waiver form and agreed to continue the interview. At no point was Mr. Bellard told that he was under arrest, and at no point did he ask to speak to his lawyer or invoke his right to silence.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Detective Campbell continued the interview, and at approximately 8:55 a.m., asked Mr. Bellard about the car he had driven to Maryland, then told Mr. Bellard that he would like to get a DNA sample and look in the vehicle. Detective Campbell read consent forms to Mr. Bellard and advised him that he did not have to sign them, that it was "strictly voluntary." Mr. Bellard signed a written consent for both the DNA sample as well as for the search of his car. An officer then searched Mr. Bellard's car and recovered a cell phone.

Detectives continued to interview Mr. Bellard for the next several hours. At approximately 1:00 p.m., as Detective Kerry Jernigan began interviewing Mr. Bellard, it became apparent that Mr. Bellard's colostomy bag was leaking. They made several attempts to obtain a new colostomy bag, but none were successful until a detective obtained one from a hospital at approximately 3:30 p.m.

While Mr. Bellard was being questioned, detectives were simultaneously tracking down other potential witnesses, including Mr. Bellard's girlfriend, T'Keisha Gilmer, who implicated Mr. Bellard in the quadruple homicide. Detective Jernigan confronted Mr. Bellard with this accusation and told him that he needed to "think through what he needs to say" and "to think about where this is going." Mr. Bellard became agitated and began yelling for "T'Keisha to tell the whole truth." Mr. Bellard later told the detectives that he and Ms. Gilmer had observed the homicides, and that a hit man from Texas had come to kill Dawn. Detective Anthony Schartner read Mr. Bellard his *Miranda* rights again, and again Mr. Bellard waived his rights. He then made a statement, which was recorded, that he and Ms. Gilmer had observed the hit man commit the murders, after which they cleaned

4

up the crime scene and disposed of their clothes and some shell casings. Detective Schartner responded that the clothes they were wearing while cleaning up the crime scene could possibly "assist him with proving that he was innocent." So Mr. Bellard agreed to leave CID to show the detectives where he had disposed of the clothes and the shell casings.

But when the trip to the alleged location of the clothes and shell casings revealed nothing, Mr. Bellard admitted to committing the murders. They returned to CID where Mr. Bellard was questioned again, and again admitted that he had shot the four people, and acknowledged that he had given the statement voluntarily. This interview was recorded as well.

Mr. Bellard was charged with four counts of first-degree murder, four counts of conspiracy to commit murder, and four counts of use of a handgun in the commission of a felony or crime of violence. On August 28, 2012, the trial court held a motions hearing during which, among other things, the court quashed Mr. Bellard's subpoenas for internal Prince George's County Police records relating to the case and a group of named officers. A hearing on a motion to suppress evidence was held on December 2 and 3, 2013, and the court denied that motion. A jury trial began on April 8, 2014, and lasted eight days.

The testimony at trial revealed that Mr. Bellard had traveled to Maryland from Texas in June 2010 with a large quantity of marijuana to sell, but the marijuana had been stolen from his hotel room. He made a second trip in August 2010, this time with Ms. Gilmer, with approximately sixty pounds of marijuana. On August 6, Mr. Bellard met Ms. Brooks and her children, broke up the marijuana in Ms. Brooks's apartment above the

5

garage, and stored it in a cooler before the group left to go to a store. When they returned to the apartment, they encountered Mwasiti Sikyala, who lived in the main part of the house. Ms. Sikyala told them that three armed men had just come from the apartment. Everyone except Ms. Sikyala went upstairs to check on the drugs, which were gone.

This discovery enraged Mr. Bellard, who went back downstairs to his vehicle with Ms. Gilmer and retrieved and loaded two .45 caliber handguns. He ushered Ms. Sikyala back upstairs, with Ms. Gilmer following behind, then shot Ms. Brooks in the leg.

He demanded that Ms. Brooks tell him where the marijuana was and accused her of stealing the marijuana and setting him up, which she denied. So he ordered Ms. Brooks, Ms. Sikyala, and Ms. Sikyala's two children into a bedroom where Ms. Gilmer held them there at gunpoint while Mr. Bellard made a phone call.

When he finished his call, Mr. Bellard summoned Ms. Brooks to the kitchen and continued interrogating her. He grabbed a pillow and shot Ms. Sikyala twice, first in the stomach, then under her chin.

Mr. Bellard tried to get Ms. Brooks into the bedroom, but she resisted, and he shot her—in the stomach and, while she was on the ground, in the ear.

Then he shot Ms. Sikyala's two young children and told Ms. Gilmer to photograph them with her phone. She complied.

The little girl was dead.

6

The little boy was not, though, and he asked if he could use the bathroom. Mr. Bellard told Ms. Gilmer to take him, and she did. When the two returned, Mr. Bellard told the boy to stand on the bed. He pointed his gun at the boy and pulled the trigger.

The gun jammed.

So Mr. Bellard took the other gun from Ms. Gilmer, shot the boy in the head, then shot him in the head again after he fell to the ground.

Ms. Gilmer took another photograph.

The two attempted to clean up the scene and dumped the evidence, including the guns, in a trash bag. They went to a hotel, showered, gathered their clothes, and Mr. Bellard threw them and the trash bag into a dumpster. A while later, Mr. Bellard returned to the scene (not wearing shoes), and encountered the officers investigating the crimes.

The jury found Mr. Bellard guilty of four counts of first-degree murder, three counts of conspiracy to commit murder, and four counts of use of a handgun in the commission of a felony. At a sentencing hearing on June 27, 2014, the court sentenced Mr. Bellard to four consecutive sentences of life without the possibility of parole for the first-degree murder convictions, and three consecutive life sentences for conspiracy to commit murder.[2]

---

[2] Additional sentences were imposed for the handgun charges, but none of those are challenged on appeal.

## II. DISCUSSION

Mr. Bellard raises six challenges to his convictions and sentences.[3] *First* and foremost, he contends that the sentencing procedure statute for first-degree murder, as amended by legislation repealing Maryland's death penalty, entitled him to elect a jury, rather than the court, to determine his sentence. *Second*, he argues, and the State agrees, that he should only have been convicted of and sentenced for one count of conspiracy to

---

[3] His brief states the Questions Presented as follows:

1. Did the circuit court err in failing to strike the Notice of Intent to Seek Sentence of Imprisonment for Life Without Possibility of Parole filed by the State?

2. Did the trial court err in sentencing Appellant on more than one count of conspiracy to commit murder?

3. Did the circuit court err in permitting the State to offer the testimony of an expert witness who was not timely disclosed in discovery?

4. Did the circuit court err in admitting evidence of prior bad acts?

5. Did the circuit court abuse its discretion when it granted the State's and the County's motion to quash the subpoena that was served on the Office of Information Technology Center and the Prince George's County Internal Affairs Division?

6. Did the circuit court err in denying Appellant's motion to suppress?

commit murder. His *third* through *sixth* questions relate to evidentiary decisions the court made before or during trial.

### A. The Trial Court Correctly Struck Mr. Bellard's Attempt To Elect Sentencing By Jury.

Mr. Bellard argues *first* that he was entitled to elect to be sentenced by a jury, and that the circuit court erred when it struck his notice to that effect and imposed life sentences without the possibility of parole. He recognizes, as he must, that non-capital murder defendants in Maryland had not historically been entitled to sentencing by jury, as capital murder defendants were. And he does not contend that the United States or Maryland Constitutions compel sentencing by jury in cases involving life without parole. His argument is a purely statutory one: that the language the General Assembly left behind in Md. Code (2002, 2012 Repl. Vol., 2015 Supp.) § 2-304(b) of the Criminal Law Article ("CR"), after removing the parts relating to the death penalty, extended to defendants facing life without parole the sentencing by jury procedures previously reserved for capital defendants. As a result, he argues, Maryland Rule 4-342 [4]—the Rule that governs sentencing procedure in non-capital cases—conflicts with the statute and must give way to the greater procedural protections. He argues as well that the "sentencing scheme for first-degree murder is void for vagueness as it lacks guidelines for the circuit court or a jury in

---

[4] Md. Rule 4-342 is titled "Procedure in non-capital cases" and "applies to all cases except those governed by Rule 4-343," which governs capital cases.

deciding whether to impose a sentence of life imprisonment without the possibility of parole."

This argument requires us to take a close look at CR § 2-304, both historically and in the form it assumed after the General Assembly amended the Criminal Law Article to repeal Maryland's death penalty. We review *de novo* questions of statutory interpretation. *Harrison-Solomon v. State*, 216 Md. App. 138, 146 (2014), *aff'd* 442 Md. 254 (2015), and our role "is to ascertain and effectuate that intent of the Legislature." *Stoddard v. State*, 395 Md. 653, 661 (2006) (quoting *Mayor of Oakland v. Mayor and of Mountain Lake Park*, 392 Md. 301, 316 (2006)). We begin with the plain language of the statute, and "[i]f the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Id.* (quoting *Jones v. State,* 336 Md. 255, 261 (1994)). We don't, however,

> read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.

*Gardner v. State*, 420 Md. 1, 9 (2011) (internal quotations and citations omitted).

The life of this case straddles major developments in the death penalty in Maryland. When Mr. Bellard was first indicted in September 2010, the authorized punishments for first-degree murder were death, life in prison without parole, and life in prison. *See* CR §2-201(b) (repealed by 2013 Md. Laws 2298. (S.B. 276). The State decided in this case to

10

file a Notice of Intent to Seek Death Penalty. *Id.*, § 2-202(a). That filing sent the proceedings down a distinct procedural path because, as the United States Supreme Court and our courts have long recognized, death is different:

> Death is a unique punishment in the United States. In a society that so strongly affirms the sanctity of life, not surprisingly the common view is that death is the ultimate sanction. This natural human feeling appears all about us. There has been no national debate about punishment, in general or by imprisonment, comparable to the debate about the punishment of death. No other punishment has been so continuously restricted, . . . nor has any State yet abolished prisons, as some have abolished this punishment. And those States that still inflict death reserve it for the most heinous crimes. Juries, of course, have always treated death cases differently, as have governors exercising their commutation powers. Criminal defendants are of the same view. "As all practicing lawyers know, who have defended persons charged with capital offenses, often the only goal possible is to avoid the death penalty." *Griffin v. Illinois*, 351 U.S. 12, 28 (1956) (Burton and Minton, JJ., dissenting). Some legislatures have required particular procedures, such as two-stage trials and automatic appeals, applicable only in death cases. "It is the universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations." *Ibid*. *See Williams v. Florida*, 399 U.S. 78, 103 (1970) (all States require juries of 12 in death cases). This Court, too, almost always treats death cases as a class apart[]. And the unfortunate effect of this punishment upon the functioning of the judicial process is well known; no other punishment has a similar effect.

*Furman v. Georgia*, 408 U.S. 238, 286-87 (1972) (Brennan, J., concurring) (footnote omitted).

In *Furman*, a splintered Supreme Court invalidated the States' then-existing death penalties, but stopped short of holding that the death penalty constituted cruel and unusual

11

punishment under all circumstances. Four years later, in *Gregg v. Georgia*, 428 U.S. 153 (1976), the Court recognized the possibility that the death penalty could be administered by the States in a manner consistent with the Eighth and Fourteenth Amendments to the Constitution. The Court has reaffirmed that principle many times as it has reviewed and refined death penalty procedures in the states that reinstated capital punishment in the intervening years. *See, e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (analyzing lethal injection protocol); *Hurst v. Florida*, 136 S. Ct. 616 (2016) (rejecting, on Sixth Amendment grounds, procedure directing judge rather than jury to find aggravating factors); *White v. Wheeler*, 136 S. Ct. 456 (2015) (*per curiam*) (qualification of death penalty juries); *Kansas v. Carr*, 135 S. Ct. 1698 (2015) (sentencing phase jury instructions). But at the risk of grossly oversimplifying a complicated area of the law, the core principle underlying the courts' (the Supreme Court's and ours) analysis of death penalty procedures is that the unique permanence of capital punishment compels procedural safeguards that other punishments do not—even punishments, such as life imprisonment without parole, that are meant to be permanent.

This "difference" manifested itself in a number of ways in Maryland's post-*Gregg* capital punishment procedures. One difference lay in the fact that, unlike non-capital cases, juries played a role in sentencing in death cases. At the time of Mr. Bellard's indictment in 2010, CR § 2-303 provided that when the State gave notice of its intention to seek the death penalty, as it had here, "a separate sentencing proceeding shall be held as soon as practicable after a defendant is found guilty of murder in the first degree to determine

12

whether the defendant shall be sentenced to death." CR § 2-303(b) (2002) (repealed 2013).

Although the court convened the proceeding, a jury decided the sentence, *id.*, (c),[5] unless

the defendant waived a jury. *Id.*, (c)(3); *see also* Md. Rule 4-343 (prescribing a bifurcated

sentencing procedure in capital cases). A separate section, CR § 2-304, defined the

sentencing procedure in cases involving life without parole. That section, the one at issue

in this case, distinguished cases in which the State only sought life without parole from

those in which the State sought death as well, and afforded a sentencing jury only in cases

where death was at stake:

> (a)　　*In general.* – (1) If the State gave notice under § 2-203(1) of this title [to seek life without parole], *but did not give notice of intent to seek the death penalty under § 2-202(a)(1)* of this title, the *court shall conduct a separate sentencing proceeding* as soon as practicable after the defendant is found guilty of murder in the first degree to determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life.
>
> (2) If the State gave notice *under both §§ 2-202(a)(1) and 2-203(1)* of this title, but the court or jury determines that the death sentence may not be imposed, *that court or jury shall determine* whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life.

CR § 2-304(a) (2010 supp.) (emphasis added).

---

[5] The sentencing proceeding was to be conducted by the same jury that determined the defendant's guilt unless the defendant pled guilty or was convicted in a bench trial, or if the court discharged the jury for good cause. *Id.*, (c)(1)-(2).

13

Put another way, the statute referred to the jury as the sentencing body only in the context of cases in which the State was seeking the death penalty. Otherwise, sentencing was left to the court.

Those were the rules as the case got under way. In response to the State's Notice of Intent to Seek Death Penalty, and amidst a variety of other pretrial motions, Mr. Bellard filed a motion to strike the Notice that the State opposed. Before the court ruled, though, the General Assembly passed and Governor O'Malley signed Senate Bill 276 (2013 Md. Laws ch. 156), which repealed the death penalty prospectively as of October 1, 2013. The State then withdrew its original Notice and filed a new one, entitled Notice of Intent to Seek Imprisonment for Life Without the Possibility of Parole, pursuant to CR § 2-203.[6] Mr. Bellard responded by filing a Notice of Election to be Tried by Jury and, if Convicted

---

[6] CR § 2-203 provides the procedure through which the State may seek a life without parole sentence in first-degree murder cases:

> A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if:
>
> (1) at least 30 days before trial, the State gave written notice to the defendant of the State's intention to seek a sentence of imprisonment for life without the possibility of parole; and
>
> (2) the sentence of imprisonment for life without the possibility of parole is imposed in accordance with § 2-304 of this title.

14

of First Degree Murder, to be Sentenced by Jury. Both parties filed motions to strike the other party's notices.

The circuit court granted the State's motion, denied Mr. Bellard's, and, after he was convicted by the jury, imposed the sentence itself. Again, the relevant statute was CR § 2-304, this time as amended by Senate Bill 276. Its death-sentence counterpart, CR § 2-303, had been stricken altogether in the repeal legislation. Section 2-304 remained—which makes sense, since life without parole was still an available sentence for first-degree murder—without references in subsection (a) to notices of intent to seek the death penalty. But the repeal also left in place, without alteration, subsection (b), which in the pre-repeal version described the findings a jury considering life without parole *in a death penalty case* was required to make. This evolution of § 2-304 is easier to see in chart form:

| CR § 2-304 before repeal (2002 Volume) | The amendments | CR § 2-304 after repeal |
|---|---|---|
| (a) *In general.* – (1) If the State gave notice under § 2-203(1) of this title, but did not give notice of intent to seek the death penalty under § 2-202(a)(1) of this title, the court shall conduct a separate sentencing proceeding as soon as practicable after the defendant is found guilty of murder in the first degree to determine whether the defendant shall be sentenced to | (a) *In general.* – (1) If the State gave notice under § 2-203(1) of this title, ~~but did not give notice of intent to seek the death penalty under § 2-202(a)(1) of this title~~, the court shall conduct a separate sentencing proceeding as soon as practicable after the defendant is found guilty of murder in the first degree to determine whether the defendant shall be sentenced to | (a) *In general.* – If the State gave notice under § 2-203(1) of this title, the court shall conduct a separate sentencing proceeding as soon as practicable after the defendant is found guilty of murder in the first degree to determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life. |

| | | |
|---|---|---|
| imprisonment for life without the possibility of parole or to imprisonment for life. | imprisonment for life without the possibility of parole or to imprisonment for life. | |
| (2) If the State gave notice under both §§ 2-202(a)(1) and 2-203(1) of this title, but the court or jury determines that the death sentence may not be imposed, that court or jury shall determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life. | ~~(2) If the State gave notice under both §§ 2-202(a)(1) and 2-203(1) of this title, but the court or jury determines that the death sentence may not be imposed, that court or jury shall determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life.~~ | |
| *(b) Findings.* – (1) A determination by a jury to impose a sentence of imprisonment for life without the possibility of parole must be unanimous. | *(b) Findings.* – (1) A determination by a jury to impose a sentence of imprisonment for life without the possibility of parole must be unanimous. | *(b) Findings.* – (1) A determination by a jury to impose a sentence of imprisonment for life without the possibility of parole must be unanimous. |
| (2) If the jury finds that a sentence of imprisonment for life without the possibility of parole shall be imposed, the court shall impose a sentence of imprisonment for life without the possibility of parole. | (2) If the jury finds that a sentence of imprisonment for life without the possibility of parole shall be imposed, the court shall impose a sentence of imprisonment for life without the possibility of parole. | (2) If the jury finds that a sentence of imprisonment for life without the possibility of parole shall be imposed, the court shall impose a sentence of imprisonment of life without the possibility of parole. |
| (3) If, within a reasonable time, the jury is unable to agree to imposition of a sentence of imprisonment | (3) If, within a reasonable time, the jury is unable to agree to imposition of a sentence of imprisonment | (3) If, within a reasonable time, the jury is unable to agree to imposition of a sentence of imprisonment |

16

| for life without the possibility of parole, the court shall impose a sentence of imprisonment for life. | for life without the possibility of parole, the court shall impose a sentence of imprisonment for life. | for life without the possibility of parole, the court shall impose a sentence of imprisonment for life. |
|---|---|---|

This is the disconnect upon which Mr. Bellard attempts to seize. Why, he asks, would the General Assembly leave in the statute the list of findings a jury would be required to make if there was no role for a jury in determining whether to sentence him to life without parole after the death penalty was repealed? In his view, there *is* no ambiguity: the base sentence for first-degree murder is life imprisonment "[u]nless a sentence of imprisonment for life without the possibility of parole is imposed in compliance with § 2-203 of this subtitle and § 2-304 of this title," CR § 2-201(b)(2), and the statute defining the sentencing procedure for life without parole describes the findings a jury must make in order for a jury to impose that sentence.

Although the language of subsection (a) seems on its own to commit sentencing to the court—"[i]f the State gave notice under § 2-203(1) of this title, *the court shall conduct a separate sentencing proceeding as soon as practicable after the defendant is found guilty of murder in the first degree to determine* whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life," CR § 2-304(a) (emphasis added)—we acknowledge that the continued presence of subsection (b) creates ambiguity. The references to two different potential sentencing bodies permits "two or more reasonable alternative interpretations of the statute." *Stoddard*, 395 Md. at 662 (quoting *Chow v. State,* 393 Md. 431, 444 (2006)). And when a statute can be

17

interpreted in more than one way, "the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." *Id.* (quoting *Chow*, 393 Md. at 444).

But we need not dig deeply into Senate Bill 276 to find its purpose. The bill's Preamble says in so many words that its purpose was "repealing the death penalty," and the Fiscal and Policy Note states that the bill "repeals the death penalty and all provisions relating to it." Fiscal and Policy Note Revised, S.B. 276 Md. at 1. Neither mentions other alterations to the sentencing authority or procedures for first-degree murder, and the provisions of the bill itself simply removed portions of the Maryland Code relating to the death penalty and replaced references to repealed language. This obviously was a complicated task, and details can—and apparently did—get overlooked. But our two alternatives are to acknowledge that subsection (b) of CR § 2-304 has become purely vestigial, or to interpolate an intention on the part of the General Assembly to create jury sentencing rights that previously didn't exist in non-capital first-degree murder cases. We see nothing in the purpose or language of the legislation itself that suggests any intent to expand jury sentencing to defendants facing life without parole. And although we could have stopped there, we reviewed the legislative history as well, and it too supports a conclusion that the purpose of the legislation was to repeal the death penalty, rather than alter sentencing procedures in non-capital murder cases.

Mr. Bellard points us to the introduction *in 2015* of (unsuccessful) legislation purporting to repeal jury sentencing in life without parole cases, and a memorandum to the

Standing Committee on Rules of Practice and Procedure by Chairman (and retired Court of Appeals Judge) Alan Wilner, alerting the Committee[7] to a "serious glitch" that he hoped the General Assembly would have solved in the 2015 Session:

> [I]n doing away with the death penalty, the General Assembly repealed the sections that provided for the death penalty and deleted references to the death penalty in other sections, including § § 2-304 and 2-305, but left intact provisions in those two sections at least suggesting, and **possibly providing**, that a determination of life with or without parole could be made by a jury.

ALAN WILNER, CHAIR, MEMORANDUM TO MEMBERS OF THE COURT OF APPEALS OF MARYLAND STANDING COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, ITEM 3 ON JUNE 18[, 2015] AGENDA – RULES 4-342 AND 4-343, HB 1135 and SB 849, 2015 Regular Session, at 2-3 (2015) (emphasis added). These developments reinforce our conclusion that some ambiguity remains in CR § 2-304, and it obviously would be cleaner if, ultimately, the statute were amended to address it. But nothing about these candid expressions of uncertainty alters our view of how the General Assembly intended that provision to function in the wake of the repeal, or demonstrates an intention to expand jury sentencing to non-criminal first-degree murder cases. Accordingly, and in light of our reading of CR § 2-304, we see no conflict with Rule 4-342, and hold that the State was authorized by CR § 2-203 to serve notice of its intent to seek a sentence of imprisonment

---

[7] The Committee was considering repealing Md. Rule 4-343 and amending Md. Rule 4-342, but to date has not acted on either.

for life without the possibility of parole; that, with the possibility of the death penalty removed, Mr. Bellard's sentencing procedures were governed by CR § 2-304(a) and Rule 4-342; and that Mr. Bellard was not entitled to elect to be sentenced by jury.

*Next*, and assuming that we didn't agree with his construction of the statute, Mr. Bellard contends that the sentencing procedures in first-degree murder cases are void for vagueness because they provide no guidelines for the imposition of a sentence of life without the possibility of parole. The State counters that this same issue was previously addressed by the Court of Appeals in *Woods v. State*, 315 Md. 591 (1989). In that case, the defendant argued that when "a life sentence without parole is imposed without following the procedures required for a sentence of death, it is unconstitutionally void for vagueness[] as offending due process of law." *Id.* at 602-03 (footnote omitted). He argued as well that without guidelines such as those that are in place for death penalty cases, he would have to "guess at the sentencing procedure if he was convicted of the crime of first degree murder." *Id.* at 603. The Court of Appeals rejected these arguments and held that a sentence of life imprisonment without the possibility of parole could be imposed without a separate sentencing proceeding before a jury. *Id.* at 608.

Mr. Bellard argues that "[b]ecause the sentencing scheme at issue in *Woods* is dramatically different from the statutory scheme that is at issue in the case *sub judice, Woods* has no bearing on whether the current statute required Appellant to be sentenced by a jury." He points us instead to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in which the Supreme Court held that any fact (other than the fact of a prior conviction) that increases

20

the penalty for a crime beyond the statutory maximum must be proven beyond a reasonable doubt by a jury. And because, as Mr. Bellard contends, a life without parole sentence is an enhanced sentence, any facts supporting the sentence enhancement must be decided beyond a reasonable doubt by a jury.

This theory falls apart, though, because life imprisonment without parole is not outside the statutory maximum for first-degree murder—it *is* the statutory maximum. *See* CR § 2-201. Indeed, *Apprendi* sought to "be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." 530 U.S. at 481 (emphasis in original). In that case, the sentence was illegal because it required proof of a *fact,* that is an element of the crime, to increase the penalty, and that fact should have been submitted to a jury and proven beyond a reasonable doubt. *Id.* at 490. But the State was not required to prove any particular fact or element to justify a sentence of life without parole rather than life—after October 1, 2013, life imprisonment without the possibility of parole *is* the maximum sentence for first-degree murder. Ultimately, we see no basis on which to distinguish this case from *Woods*, and thus no basis on which to find the sentencing procedures at issue unconstitutionally vague.

**B.     The Trial Court Incorrectly Sentenced Mr. Bellard On More Than One Count Of Conspiracy To Commit Murder.**

21

*Second*, Mr. Bellard asserts that the trial court erred by sentencing him to more than one count of conspiracy to commit murder because the evidence did not support a finding of more than one conspiracy, because the jury was not instructed to make a determination that Mr. Bellard entered into more than one conspiracy, and because the State did not argue that Mr. Bellard entered into more than one conspiracy. The State agrees, and we concur that the allegations, evidence, and jury instructions support a conviction for one criminal agreement to murder three people, not three separate agreements to murder one person each. Accordingly, we vacate two of the conspiracy convictions and corresponding consecutive life sentences. *See Savage v. State*, 212 Md. App. 1, 26 (2013).

### C. The Trial Court Properly Admitted Testimony Of The State's Expert Witness.

*Third*, Mr. Bellard argues that the "circuit court erred in failing to strike the State's expert as a sanction for the State's belated disclosure." We review sanctions imposed for discovery violations for abuse of discretion. *Rosenberg v. State*, 129 Md. App. 221, 259 (1999).[8] And although Maryland Rule 4-263 gives trial courts the discretion to fashion remedies for discovery violations, *id.*, the Rule does not require the court to take any particular action or any action at all. *Thomas v. State*, 397 Md. 557, 570 (2007).

---

[8] We disagree with Mr. Bellard's contention, citing *Duckett v. Riley*, 428 Md. 471, 476-77 (2010), that we review this decision *de novo*. That case had required the circuit court to interpret the meaning of the word "paper" as used in Md. Rule 2-325(a), *id.* at 476, a statutory construction issue that we don't have here.

22

Mr. Bellard moved *in limine* to exclude the State's expert witness, Detective James Seger, whom the State proffered to testify regarding cell phone towers and records relating to Mr. Bellard's cell phone. During the hearing, defense counsel argued that the State's failure to turn over the name of the expert prejudiced the defense's preparation:

> Having someone from the cell tower is completely different from having a detective testify. We didn't have their name, CV or anything until last week. And so it's very difficult to prepare for some expert X, whose name we don't know, whose qualifications we don't know, testifying to opinions we don't know.

The State admitted that it had not disclosed the name of the expert in a timely manner, but explained that it had only just found someone to testify:

> [W]e were not in possession of [the name] until we were able to find somebody who would be able to do this, since we were going from a situation of having people with the cell companies to having officers who are now trained to do this.

The State argued as well that Mr. Bellard suffered no prejudice from the late disclosure because the State had disclosed in a letter that an expert would be testifying to the opinions contained in the records. The only thing lacking, the State argued, was the name of the particular person who would be testifying, and this fact alone did not prejudice Mr. Bellard since he had had the contents of the opinions for three years. The State also explained that it had made the witness available for the defense to interview, but counsel had declined that offer.

23

The trial court initially denied the motion without explanation, but clarified its ruling when Mr. Bellard renewed the motion before Detective Seger testified at trial, finding that Mr. Bellard had notice of the subject matter of the expert's testimony:

> I'm not going to strike his testimony based on that since it is the Court's belief you've had sufficient time and I deduce[] that you have previously been given notice of the existence of the subject matter about which he may be expressing an opinion. **(T.5.82)**

Although we agree with Mr. Bellard that the State violated Rule 4-263 by not providing the expert's name in a timely manner, we find no abuse of discretion in the trial court's decision not to strike the expert's testimony. The purpose of Md. Rule 4-263 is "to prevent a defendant from being surprised and to give a defendant sufficient time to prepare a defense." *Jones v. State*, 132 Md. App. 657, 678 (2000). The trial court found that Mr. Bellard was not prejudiced by the late discovery notice because he had "sufficient time" and had "been given notice of the existence of the subject matter about which he may be expressing an opinion." And although the late disclosure of the expert's identity might well have consumed attention close to trial, Mr. Bellard alleges no particular prejudice from the delay. Thus, it fell well within the trial court's discretion to deny Mr. Bellard's motion.

### D. The Trial Court Properly Admitted Evidence of Prior Bad Acts As Evidence Of Motive.

*Fourth*, Mr. Bellard contends that the trial court erred by admitting evidence of prior bad acts that "did not fit within the exception for motive," and "the probative value of the

24

evidence did not outweigh the prejudicial effect." Although "evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial," *Straughn v. State*, 297 Md. 329, 333 (1983), evidence of other crimes may be introduced if it is independently relevant. *Id.* at 333. Maryland Rule 5-404(b) provides a non-exhaustive list of alternative bases:

> Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

When presented with other crimes evidence, the trial court follows the three-step analysis from *State v. Faulkner*, 314 Md. 630 (1989). *First*, the court determines whether the evidence falls into one of the recognized exceptions, such as motive, opportunity, intent, or preparation. This is not a matter of discretion, and we review that categorization *de novo*. *Second*, if the evidence falls into a category of exceptions, the court decides by clear and convincing evidence whether the defendant was involved in the prior crime or bad act, and we review that finding for sufficiency of the evidence. *Third*, the court balances the probative value of the evidence against the danger of unfair prejudice, a determination we review for abuse of discretion. *Id.* at 634.

In this case, the State moved *in limine* to introduce evidence (through detectives and Ms. Gilmer) that during a trip to Maryland to sell marijuana in June 2010, Mr. Bellard had been "ripped off" by someone connected to Ms. Brooks. The State argued that this

25

evidence met every prong of the *Faulkner* test: *first*, it was relevant to show intent and motive; *second*, it was supported by clear and convincing evidence through three separate statements by Mr. Bellard and Ms. Gilmer; and *third*, the probative value substantially outweighed any unfair prejudice because there had already been one reference to Mr. Bellard bringing marijuana and guns into Maryland during the August trip. The State argued that the prior theft established the context for Mr. Bellard's reaction to the missing marijuana this time, and "would clearly help the jury understand why it is he killed them this time."

The trial court initially reserved its ruling on the evidence. During Detective Stephen Campbell's testimony, defense counsel renewed his objection, arguing that it should not be admitted as proof of motive. The State reiterated its previous argument, explaining how the evidence met every prong of the *Faulkner* test. The trial court decided to allow it, noting that any statements made by Mr. Bellard would come in under a hearsay exception, and that "in terms of other crimes exceptions, then the court is making a determination that it may be probative on the issue of motive and that its probative value substantially outweighs the undue prejudice."

In his brief, Mr. Bellard argues that the evidence failed all three of the *Faulkner* steps. He argues that this evidence is not properly characterized as motive evidence, that the court's finding that the evidence "may" show motive didn't satisfy the standard, and that the unfair prejudice from the "deliberate and repeated introduction by the State of

unproven drug trafficking" was highly prejudicial and not necessary to prove motive. We disagree.

*First*, Mr. Bellard's prior experience having marijuana stolen from him by someone connected to Ms. Brooks amply explains his motive to shoot her and the people who witnessed the shooting (and who may also have witnessed the theft).[9] *Second*, Mr. Bellard's own statement, along with statements by other witnesses regarding Mr. Bellard's prior trip to Maryland to sell marijuana and being "ripped off" by someone who was introduced to him by one of the victims, support the trial court's finding that the prior acts had been proven by clear and convincing evidence. And *third*, evidence of the prior trip, during which Mr. Bellard's drugs were stolen, coupled with the evidence that his drugs were taken a second time during the August trip, demonstrates that Mr. Bellard shot and murdered Ms. Brooks because he believed she was responsible for both of the thefts. The probative value of this evidence substantially outweighs any chance of unfair prejudice,

---

[9] In arguing that the evidence does not fall under the motive exception, Mr. Bellard points us to *Vitek v. State,* 295 Md. 35 (1982). Mr. Bellard argues that here, as in *Vitek,* there was a perfectly obvious motive for the crime: "Appellant had left drugs in the apartment of Dawn Brooks. When they returned to the apartment and the drugs had been stolen, Appellant was angry and allegedly killed all of the people who saw him shoot Dawn in an attempt to find out who had taken his drugs. The fact that Appellant previously brought drugs to Maryland and those drugs had been stolen was 'not probative of the proposition at which it is directed'– that Appellant had a motive. *Id.* It was therefore, irrelevant." This argument proves the point, though, and distinguishes *Vitek,* in which the attenuated connection between the defendant's financial status and his motive to commit a crime created, at most, a generalized motive. *Id.* at 40.

particularly since the jury had already heard testimony that Mr. Bellard was a drug dealer and had possessed a gun, and we discern no error in the court's decision to admit it.

> **E.     The Trial Court Did Not Abuse Its Discretion By Granting The State's And County's Motion To Quash The Subpoena Served On The Office Of Information Technology Center And The Prince George's County Internal Affairs Division.**

*Fifth*, Mr. Bellard contends that the circuit court abused its discretion by granting the State's and County's motion to quash the subpoena he served on the County's Office of Information Technology and the Prince George's County Police's Internal Affairs Division seeking emails relating to the investigation of these crimes and the disciplinary records of officers. He argues that the trial "court did not engage in a balancing test of either of the competing interests of Appellant and the party asserting confidentiality. The circuit court, instead, ruled that *Brady*[10] was the law of Maryland, which was not the appropriate consideration for the requests made by Appellant." The State counters that the trial court did not abuse its discretion because Mr. "Bellard was not entitled to any investigatory records, *i.e.*, emails related to his case, except those the State was required to disclose under the discovery rules." We review a decision to issue a protective order for abuse of discretion. *Coleman v. State*, 321 Md. 586 (1991).

Upon motion by a party, the circuit court may quash a subpoena and issue a protective order when "justice requires to protect the party or person from annoyance,

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

embarrassment, oppression, or undue burden or expense." Md. Rule 4-266(c). When reviewing a defendant's request for confidential documents, the court "balances competing interests: those of the party holding the protection of confidentiality and those of the defendant who has the right to confront witnesses against him or her." *Fields v. State,* 432 Md. 650, 667 (2013). *First*, the defendant must demonstrate a "need to inspect," which is "a reasonable possibility that review of the records would result in discovery of usable evidence." *Id.* at 667 (quoting *Zaal*, 326 Md. at 81). The strength of this need to inspect depends upon factors such as "the nature of the charges brought against the defendant, the issue before the court, and the relationship . . . between the charges, the information sought, and the likelihood that relevant information will be obtained as a result of reviewing the records." *Id.* (quoting *Zaal*, 326 Md. at 81-82). *Then*, if the court finds that the defendant has established a need to inspect, "the court may elect to review the records alone, to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to such restriction as the court requires." *Id.* (quoting *Zaal*, 326 Md. at 87).

Mr. Bellard argues that the trial court didn't balance the interests at all. But in its written motion and during the motions hearing, the State detailed the balancing test and argued why Mr. Bellard had not met the initial burden of demonstrating a "need to inspect," as *Zaal* required. The State argued that the defense "never identified, as required by the courts, a precise issue that would make this case–that would be relevant to this case. No specific incident." Defense counsel, on the other hand, argued, "it's quite clear that the

point of the subpoena is to get emails that can be used in this criminal prosecution, that can be used in Mr. Bellard's own defense." After hearing both sides, the court agreed with the State. And once the court found that Mr. Bellard did not meet the initial burden of demonstrating a "need to inspect," the court did not reach the remainder of the balancing test.

Both subpoenas sought broad swaths of investigative and personnel files not normally subject to disclosure, *see Faulk v. State's Attorney*, 299 Md. 493, 509-11 (1984); *Blythe v. State*, 161 Md. App. 492, 555 (2005), and there were genuine issues about whether the subpoenas defined the records with appropriate specificity. Judges are presumed to know and apply the law correctly, *State v. Chaney*, 375 Md. 168, 181 (2003), and although the court might have articulated its analysis more explicitly, the transcript reveals that the court fully considered the issues before granting the State's motions. Moreover, Mr. Bellard offered only general arguments in support of his need for these files, and no reason beyond hope to believe that either set of files would have contained relevant, admissible evidence. We see no abuse of discretion in the court's decision to quash these subpoenas.

## F. The Trial Court Properly Denied Mr. Bellard's Motion To Suppress.

Mr. Bellard's *final* argument, that the trial court erred in denying his motion to supress evidence, has three components: *first*, that he was illegally seized at the crime scene; *second*, that he did not voluntarily consent to allow officers to search his car; and

*third*, that the statements he gave were not lawfully obtained. We disagree with all three assertions.

We review a motion to suppress against the facts developed at the motion hearing, *Hill v. State*, 418 Md. 62, 67 n.1 (2011), viewing the evidence in the light most favorable to the prevailing party, *Robinson v. State*, 419 Md. 602, 611-12 (2011), in this case the State. We defer to the motion court's factual findings and uphold them unless they are clearly erroneous. *State v. Luckett*, 413 Md. 360, 375 n.3 (2010). Whether a confession is voluntary presents a mixed question of law and fact, subject to *de novo* review. *Jones v. State,* 173 Md. App. 430, 441-42 (2007).

### 1. Mr. Bellard was not seized unlawfully.

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment in *Mapp v. Ohio*, 367 U.S. 643 (1961), prohibits the government from conducting unreasonable searches and seizures. A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Mere questioning by police does not constitute a seizure and, therefore, does not implicate the Fourth Amendment if a reasonable person in the situation would feel free "to disregard the police and go about his business." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

Mr. Bellard asserts that he was seized illegally at the crime scene because he "was not told that he was free to leave, he was not permitted to go to his vehicle to get cigarettes,

31

and was repeatedly asked to stay at the scene to answer questions." Whether a reasonable person would feel free to leave an encounter with a police officer depends on the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or made physical contact that would suggest to a reasonable person that he or she was not free to leave. *Ferris v. State*, 355 Md. 356, 377 (1999).

We agree with the circuit court that, based on the totality of the circumstances, Mr. Bellard was not seized at the crime scene. This was a complex, quadruple-homicide investigation, with numerous officers and several witnesses present at the scene. And although the officers informed Mr. Bellard that he would need to answer some questions and was not allowed to retrieve cigarettes from his vehicle, the exercise of police authority was reasonable under the circumstances. Mr. Bellard appeared on the scene voluntarily— remember, he had left after the shootings and returned entirely on his own. He had told the officers that he knew the victims, had spent time with them earlier in the day, and had returned to "check on his friends." Mr. Bellard presented himself to the police as a possible witness with helpful information and was treated as one. He was cooperative, and voluntarily went to the police station to answer questions. The police exhibited no

32

threatening behavior and in fact allowed him to move freely around the area, unattended and unrestrained.

### 2. Mr. Bellard consented knowingly and voluntarily to the search of his vehicle.

"For a consensual search to satisfy the Fourth Amendment, it must be voluntary, *i.e.*, free of coercion." *Varriale v. State,* 444 Md. 400, 412 (2015) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  The burden of proving voluntariness lies with the State, and depends upon the totality of the circumstances. *Mendenhall*, 446 U.S. at 557.

Mr. Bellard asserts that he "was forced to 'consent' to the search of the vehicle in order to obtain the colostomy bag that he needed to replace the attached bag that was damaged."  But the facts don't support that argument.  Mr. Bellard was taken to CID at approximately 5:00 a.m. to be questioned.  At some point during this questioning, around 7:00 a.m., Mr. Bellard inculpated himself by indicating that he was trafficking marijuana.  After that, he was *Mirandized*, and, shortly thereafter at approximately 9:50 AM, he signed a consent form authorizing the search of his vehicle.  There is no mention of a leaky colostomy bag until approximately 1:00 p.m.  To the contrary, the officers read the consent form to Mr. Bellard in its entirety and told him that he did not have to consent to the search, and Mr. Bellard stated that he understood the form before he signed it.

### 3. Mr. Bellard confessed freely and voluntarily.

33

Mr. Bellard's *final* contention, that his statement was not lawfully obtained, rests on two premises: *first*, that his right to prompt presentment was violated; and *second*, that his statements were the result of an unlawful promise or benefit.

Only voluntary confessions are admissible as evidence. *Hoey v. State*, 311 Md. 473, 480-81 (1998). A confession is voluntary if it is "freely and voluntarily made" and the defendant making the confession "knew and understood what he was saying" at the time he or she said it. *Id.* To be voluntary, a confession must satisfy the requirements of the U.S. Constitution, the Maryland Constitution and Declaration of Rights, Maryland non-constitutional law, and the United States Supreme Court's decision in *Miranda. Knight v. State*, 381 Md. 517, 531-32 (2004). When assessing voluntariness, courts look to the totality of the circumstances, *Winder v. State*, 362 Md. 275, 307 (2001), including factors such as where the interrogation was conducted; its length; who was present; how it was conducted; its content; whether the defendant was given *Miranda* warnings; the mental and physical condition of the defendant; when the defendant was taken before a court commissioner following arrest; and whether the defendant was physically mistreated, or physically intimated or psychologically pressured. *Perez v. State*, 168 Md. App. 248, 268 (2006) (quoting *Hof v. State*, 337 Md. 581, 596 (1995)). "[A] confession is involuntary if it is the product of certain improper threats, promises, or inducements by the police." *Lee v. State*, 418 Md. 136, 161 (2011). The State has the burden to prove, by a preponderance of the evidence, that the confession was voluntary. *Id.*

Mr. Bellard argues *first* that his statement was not obtained lawfully because the State violated his right to prompt presentment. Maryland Rule 4-212(f)(1) requires that upon arrest, a defendant "be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest." Mr. Bellard asserts that once he admitted during questioning to drug activity and possession of a hand gun, he should have been taken before a commissioner and charged. This delay in presentment, he says, should be given "very heavy weight" in determining whether his confession was voluntary.

Mr. Bellard is correct "that any deliberate or unnecessary delay in presenting an accused to a District Court Commissioner, in violation of Rule 4-212(e) or (f) must be given *very heavy weight* in determining whether a resulting confession is voluntary," *Williams v. State*, 375 Md. 404, 453 (2003) (emphasis in original) (internal quotations and citations omitted), but the record does not reflect any deliberate or unnecessary delay. The officers were not interested in charging Mr. Bellard in connection with drug crimes: they were investigating a quadruple homicide and thought Mr. Bellard might have important information regarding that case. After Mr. Bellard made the inculpating statements regarding drug trafficking, he was *Mirandized* and waived his rights before making any statements about the homicides.

The record supports the trial court's finding that the *Miranda* waiver was knowing and voluntary. Mr. Bellard had two years of college education, and Detective Campbell and Mr. Bellard read the waiver form to him out loud together. Mr. Bellard stated that he

35

understood his rights, then signed the waiver form. Moreover, the record reveals no unnecessary delay in bringing Mr. Bellard before a district court commissioner before he signed the waiver. Detectives testified that during the interview Mr. Bellard gave them valuable information about the crime scene and lead them to other potential witnesses. Delaying presentment for these inquires did not violate Mr. Bellard's right to prompt presentment. *Id.* at 420 (explaining that some delays are necessary, including delays to determine whether a charging document should be issued accusing the arrestee of a crime, and to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may be associated with the arrestee in the commission of the offense).

*Second*, Mr. Bellard contends that his confession was "involuntary and unconstitutionally obtained because the statements were the result of an unlawful promise of a benefit." Again, the facts established at the suppression hearing paint a different picture.

Under Maryland common law, a statement is involuntary and inadmissible if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement. *Williams v. State*, 445 Md. 452, 478 (2015) (internal quotations and citations omitted). In *Winder*, the Court of Appeals explained that a confession is involuntary if:

36

> (1) a police officer or an agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and (2) the suspect makes a confession in apparent reliance on the police officer's statement. 372 Md. at 309.

Both prongs must be satisfied for the confession to be deemed involuntary. *Id.*

Mr. Bellard claims that Detective Jernigan improperly induced him to confess by telling him that "Ms. Gilmer was implicating him and he needed to think about that," and that "he needed to get his statement out there first." At the suppression hearing, Detective Jernigan testified that after being told Ms. Gilmer incriminated Mr. Bellard in the homicide, he had a brief contact with Mr. Bellard and said:

> [L]ook, this is what's being said as far as her pointing the finger in his direction . . . I said he needs to kind of think through what he needs to say, and if he wants her to basically give us – whether it be an accurate version or a somewhat glorified version, I said he needs to think about where this is going.

Mr. Bellard contends that Detective Jernigan's statement implied that the police would believe and act on the statement if Mr. Bellard provided them with information first. But Detective Jernigan made no such promise, nor suggested that Mr. Bellard would receive special treatment if he confessed. Moreover, Mr. Bellard doesn't contend that Detective Jernigan's statement induced him to confess, and nothing in the record suggests that it did.

Mr. Bellard also claims that Sergeant Anthony Schartner induced him to confess by telling him that the clothing from the scene that Mr. Bellard had previously discarded might assist in proving his innocence. Again, this statement neither promised nor suggested that

37

Mr. Bellard would receive a benefit or special treatment. Mr. Bellard did not testify at the hearing, and as the trial court correctly noted, the failure of a defendant to testify at a suppression hearing when the issue is voluntariness, rather than *Miranda* compliance, seriously hinders his chances of prevailing. *Ashford v. State*, 147 Md. App. 1, 56 (2002).

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED AS TO TWO CONVICTIONS AND SENTENCES FOR CONSPIRACY TO COMMIT MURDER AND AFFIRMED IN ALL OTHER RESPECTS. COSTS ASSESSED 22% TO PRINCE GEORGE'S COUNTY AND 78% TO APPELLANT.**